# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERICK COLLETTI<br>   Plaintiff<br><br>v.<br><br>CROWN PA GAMING, INC. d/b/a<br>DRAFTKINGS<br>   Defendant | Civil Action No. 2:23-cv-02036-CFK<br><br><br><br><br><br>**JURY DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff, Erick Colletti, by and through his attorneys, ROGERS COUNSEL, hereby brings this action at law and respectfully avers the following facts:

### THE PARTIES

1. Plaintiff, Erick Colletti ("Plaintiff"), is an adult individual residing within Philadelphia County, Pennsylvania, and utilizing the address of 26 East Athens Avenue, Ardmore, PA 19003 for service of legal papers.

2. Defendant, Crown PA Gaming, Inc., ("Defendant"), is a corporation formed and existing pursuant to Delaware state law, with a registered agent designated to accept service at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Defendant conducts business as DraftKings and is registered as a foreign business corporation in the Commonwealth of Pennsylvania.

### JURISDICTION AND VENUE

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as Plaintiff and Defendant are citizens of different states, and the matter in controversy exceeds the sum of Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions that gave rise to Plaintiff's claim occurred within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania.

## BACKGROUND

5. Defendant operates an online sportsbook and casino in the Commonwealth of Pennsylvania pursuant to a license issued by the Pennsylvania Gaming Control Board. Defendant offers such services to consumers through, among other things, its smart phone application: DraftKings Sportsbook & Casino (the "App").

6. The App offers users various methods of gambling, including, but not limited to, placing "parlay wagers" on sporting events. A parlay wager is made when a bettor makes two (2) or more bets and combines them into one wager. The bettor must win every bet within the parlay wager to win – losing just one (1) of the bets within the parlay causes the bettor to lose the parlay.

7. Bettors generally make parlay wagers as the odds of winning are lower, meaning the payout upon a successful wager is much higher. The various bets combined within a parlay are generally referred to as "legs." Thus, a "parlay with 3 legs" means the player combined three (3) separate bets into the same wager – if even one (1) leg misses, the wagered money is lost.

8. Plaintiff was a frequent user of the App's sportsbook. Plaintiff often engaged in diligent research prior to placing a wager, and considered himself above average when it came to predicting a wager's outcome.

9. Sportsbooks, such as Defendant, also engage in diligent research and perform extensive statistical analysis to set the "odds", *i.e.* chance of winning, of the wagers offered. The lower the odds, the greater the payout.

10. Given the data, research, and other materials that are available to legalized sportsbooks, they are generally accurate when setting odds. In addition, the odds of sports bets change at various times leading up to a game based on many factors such as a change in circumstances (injuries, etc.) or the amount of money wagered on a specific outcome.

11. Thus, given the nature of the sportsbook business, it is difficult for even an above average gambler to profit long term. The odds are stacked against the bettor.

12. On or about May 29, 2021, after conducting the relevant research, Plaintiff used the App's sportsbook to place two (2) parlay wagers.

13. Plaintiff's first wager was a three (3) leg parlay, where Plaintiff risked $125,000.00 ("Parlay 1"). For Plaintiff to win Parlay 1, the following outcome was necessary:

    (a) the LA Lakers had to win their series against the Phoenix Suns in the first round of the 2021 NBA playoffs;

    (b) the Utah Jazz had to win their series against the Memphis Grizzlies in the first round of the 2021 NBA playoffs; and,

    (c) the Tampa Bay Lightning had to win their series against the Carolina Hurricanes in the 2021 NHL playoffs.

14. Plaintiff's second wager was a four (4) leg parlay, where Plaintiff risked $28,000.00 ("Parlay 2"). For Plaintiff to win Parlay 2, in addition to the outcomes set forth in paragraphs 8(a)-(c) above (which were also legs within Parlay 2), the Vegas Golden Knights and Colorado Avalanche had to play more than 5.5 games in their series when they faced off in the 2021 NHL playoffs.

15. If Plaintiff's parlay wagers were successful, Defendant was required to pay Plaintiff $380,410.00. If either the LA Lakers, Utah Jazz, or Tampa Bay Lightning lost their

respective series, Plaintiff would lose Parlay 1 and 2. If the aforementioned three (3) teams won, but the Golden Knights and Avalanche finished their series in five (5) or fewer games, Plaintiff would win Parlay 1, but lose Parlay 2.

### **A Series Changing Injury**

16. When Plaintiff agreed to accept the odds and risk his money by placing wagers on Parlays 1 and 2, the LA Lakers were leading their series against the Phoenix Suns 2-1. The relevant research and expected analysis caused Plaintiff to conclude that the Lakers would take a 3-1 lead in the series following the fourth game, which was scheduled for May 30, 2021.

17. However, during the fourth game of the Lakers-Suns series, the LA Laker's star player, Anthony Davis ("A.D."), left the game due to a strained groin. With the loss of A.D., the Phoenix Suns won the fourth game, resulting in the series being tied at 2-2.

18. A healthy A.D. playing throughout the entire series was an important part of Plaintiff's betting calculus. A.D.'s injury materially altered Plaintiff's initial, well-reasoned prediction, and led him to conclude that the Phoenix Suns would now win the series, especially if A.D. could not play in the next game.

19. Defendant offers a "Cash Out" option on many of its single and parlay wagers. The option can be available in both pre-game and live betting situations. Defendant describes its "Cash Out" option in the following way:

> The 'Cash Out' function allows the Authorized Account Holder the possibility to redeem a bet, which status has not been settled yet, at a value specified by DraftKings at the time the Cash Out is offered. It is available on selected events both in pre-game and live, as well as on both single and parlay bets. Cash Out functionality cannot be used on free bets. Cash Out requests might be subject to an imposed delay. Should it happen that during this delay, for whatever reason, either the offer is removed or odds fluctuate, the Cash Out request will not be accepted and the Authorized Account Holder will be notified with an on-screen message. DraftKings reserves the right to offer such functionality solely at its own discretion and does not

acknowledge or accept any liability whatsoever if the Cash Out functionality is not available. Should a Cash Out request be successful, the bet will be settled immediately and any subsequent events which occur in relation with the bet will not be taken into account. In the instance of a cashed-out bet having suffered from a technical, pricing or settlement error at any time between the time of original placement and the cash out, DraftKings reserves the right rectify such inaccuracy in DraftKings' sole discretion.

20. Although Defendant's "Cash Out" description does not clearly identify how and when an "Account Holder" is offered the "Cash Out" option for a pending wager, the answer becomes clear when utilizing the App. When a "Cash Out" is offered, a large, yellow CASH OUT button appears within the App. The button displays the monetary value of the "Cash Out" amount offered.

21. Following A.D.'s injury, the "Cash Out" option was offered to Plaintiff, and appeared as follows within the App:



The Cash Out offered on Parlay 1



The Cash Out offered on Parlay 2

22. Given the injury to A.D., Plaintiff knew that opting for the "Cash Out" option was not just the prudent choice, but given Plaintiff's understanding of how A.D.'s injury dramatically reduced Plaintiff's chance of winning the wagers, it was his only choice.

**Plaintiff Accepts Defendant's "Cash Out" Offer**

23. As depicted above, the "Cash Out" offer was indeed made available to Plaintiff for both Parlays. In unequivocal terms, the large yellow CASH OUT button, with the available cash out amount, appeared on the App for Plaintiff's Parlays.

24. For Parlay 1, in exchange for forgoing the potential to win $276,250.00, Defendant offered Plaintiff a cash out of $128,225.37. Plaintiff accepted the offer by pressing the large yellow CASH OUT button on the App.

25. Likewise, in exchange for forgoing the potential to win $104,160.00 on Parlay 2, Plaintiff accepted Defendant's offer to cash out Parlay 2 by pressing the large yellow CASH OUT button on the App. The "Cash Out" amount for Parlay 2 was $29,745.49.

26. Instead of performing its obligation to cash out the Parlays upon Plaintiff's acceptance of the offer, there was an error with the App. When Plaintiff accepted the offer, the "Cash Out" option was not suspended and Plaintiff's account was not restricted. Indeed, the CASH OUT button was illuminated bright yellow, indicating the option's availability.

6

27. Defendant's failure to perform was nothing short of catastrophic for Plaintiff. As anticipated, without A.D., the Lakers lost the series 4-2, resulting in Plaintiff losing both Parlays. As Defendant failed and/or refused to uphold its end of the bargain following Plaintiff's acceptance of the offer, Plaintiff did not receive the $157,970.46 "Cash Out."

28. Plaintiff was successful in predicting the remaining legs of Parlays 1 and 2. Still, the outcome was irrelevant, because, as Plaintiff predicted, the Lakers lost.

29. Following the incident, Plaintiff made repeated inquiries to Defendant's customer service. Defendant refused to honor the cash out and eventually suspended Plaintiff's account.

30. Defendant's failure to tender payment and refusal to honor the cash out constitutes a breach of contract. Defendant is in wrongful possession of Plaintiff's "Cash Out" proceeds of $157,970.46.

## COUNT I
### *Breach of Contract*

31. Plaintiff incorporates paragraphs "1" through "30" by reference as though the same were fully set forth herein.

32. Defendant and Plaintiff entered into a valid agreement when Plaintiff placed and Defendant accepted the Parlays.

33. Subsequently, a second agreement, and/or an accord, was formed when Defendant offered and Plaintiff accepted the option to "Cash Out" Parlays 1 and 2 for $157,970.46.

34. In exchange for a payment of $157,970.46 on Parlays 1 and 2, Plaintiff agreed to forgo the potential of winning an additional $222,439.54.

35. Plaintiff's decision to accept the "Cash Out" was calculated, in that the certainty of a smaller payout was more beneficial than the risks associated with counting on the Lakers to win their series without A.D.

36. Despite Plaintiff's acceptance of the "Cash Out" offer, Defendant failed to uphold its end of the bargain through its refusal to settle the Parlays for the offered "Cash Out" amount.

37. Upon information and belief, Defendant received Plaintiff's "Cash Out" request, yet failed to honor the same for unknown reasons.

38. Defendant's failure and/or refusal to perform following Plaintiff's acceptance of the offer constituted a breach of contract.

39. As an actual and proximate result of Defendant's failure to perform under the contract formed when Plaintiff accepted the "Cash Out" offer, Plaintiff suffered economic and non-economic damages, including but not limited to the $157,970.46 payment to which he was entitled.

**WHEREFORE**, Plaintiff demands judgment against Defendant for his direct and compensatory damages, plus costs and any other such remedy as the Court shall order.

### COUNT II
*Promissory Estoppel / Unjust Enrichment*

40. Plaintiff incorporates paragraphs "1" through "39" by reference as though the same were fully set forth herein.

41. As set forth above, Defendant represented to Plaintiff, through the App, that a "Cash Out" payment was available on Parlays 1 and 2 and could be accepted by pressing the applicable yellow button.

42. Plaintiff, relying on the representation made within Defendant's App, accepted the "Cash Out" offer, believing it would alleviate the risks associated with the Parlays and cause Defendant to credit his account for the offered amount.

43. Plaintiff's reliance on the representation within Defendant's App was at all times reasonable. Plaintiff had cashed out wagers on prior occasions. In addition, on prior occasions, even when an error message appeared or the App didn't immediately show the offered "Cash Out" amount credited to Plaintiff's balance, the action was successful and the wager was subsequently cashed out when Plaintiff next logged into the App.

44. Plaintiff relied on Defendant's representation to his detriment, in that the "Cash Out" did not go through, the wagers were not cancelled, and Plaintiff subsequently lost the entirety of the money he staked.

45. Thus, pursuant to the doctrine of promissory estoppel, the law implies a contract, and Defendant should be compelled to uphold its representations, even if the Court ultimately determines a contract did not exist between the parties.

46. Given the availability of the "Cash Out" option, Plaintiff accepting the same by pressing the button, and the instances of such actions resulting in a cash out on prior occasions, equity demands a remedy for Plaintiff. Allowing Defendant to retain Plaintiff's wager, despite Plaintiff utilizing the "Cash Out" feature, will result in Defendant being unjustly enriched in the amount of Plaintiff's original wager.

\*         \*         **[Intentionally Blank]**         \*         \*

**WHEREFORE**, Plaintiff demands judgment against Defendant for his direct and compensatory damages, plus costs and any other such remedy as the Court shall order.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, Erick Colletti, demands a trial by jury in this action of all issues so triable.

Respectfully submitted,

Dated:  June 2, 2023              ROGERS COUNSEL

*/s/  Brian T. Newman*
Brian T. Newman (Brian@RogersCounsel.com)
26 East Athens Avenue
Ardmore, PA 19003
Telephone: 610.649.1880
Facsimile: 877.649.1880

*Attorneys for Plaintiff, Erick Colletti*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ERICK COLLETTI<br>　　　　Plaintiff<br><br>　　v.<br><br>CROWN PA GAMING, INC. d/b/a<br>DRAFTKINGS<br>　　　　Defendant | Civil Action No. 2:23-cv-02036-CFK<br><br>**CERTIFICATE OF SERVICE** |

I, Brian T. Newman, Esq., hereby certify that on June 2, 2023, I caused electronic copies of Plaintiff's First Amended Complaint to be electronically filed in the above-captioned matter, and thus served upon all counsel of record via the Court's ECF system.

　　　　　　　　　　　　　　　　　　Respectfully submitted,

Dated: June 2, 2023　　　　　　　　ROGERS COUNSEL

　　　　　　　　　　　　　　　　　　　*/s/ Brian T. Newman*
　　　　　　　　　　　　　　　　　　Brian T. Newman (Brian@RogersCounsel.com)
　　　　　　　　　　　　　　　　　　26 East Athens Avenue
　　　　　　　　　　　　　　　　　　Ardmore, PA 19003
　　　　　　　　　　　　　　　　　　Telephone: 610.649.1880
　　　　　　　　　　　　　　　　　　Facsimile: 877.649.1880

　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff, Erick Colletti*